IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GULF COAST RENTAL CO L.L.C.,  )
                              )
    **Plaintiff,**               )
                              )
v.                            )  CIVIL ACTION 25-0057-WS-M
                              )
CITY OF GULF SHORES,  et al., )  <u>PUBLISH</u>
                              )
    **Defendants.**              )

## ORDER

This matter is before the Court on three motions for summary judgment.  The first was filed by the City of Gulf Shores ("the City") and the City of Gulf Shores City Council ("the Council").  (Doc. 49).  The second was filed by the individual defendant ("Andrews").  (Doc. 51).  The third, a motion for partial summary judgment, was filed by the plaintiff.  (Doc. 54).  The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 50, 52, 54, 73-75, 77-79), and the motions are ripe for resolution. After careful consideration, the Court concludes that the defendants' motions are due to be granted in part, that the plaintiff's motion is due to be denied in part, and that the remainder of this action is due to be remanded pursuant to 28 U.S.C. § 1367(c)(3).

## BACKGROUND

According to the second amended complaint, (Doc. 1-6 at 166-80), Andrews is employed by the City as its revenue supervisor.  In April 2022, the plaintiff submitted an application ("the Application") for a business license for the rental of golf carts, low-speed vehicles, and similar vehicles (collectively, "golf carts").  Andrews declined to issue the license, and the plaintiff requested to appear before the Council, which appearance occurred in late July 2022.  In early August 2022, the plaintiff received

formal notice that the Application had been denied; no basis or reasoning for the denial was provided.  The City and Council subsequently enacted an ordinance ("Ordinance 2127") that effectively bans the rental or leasing of golf carts within the City.

The second amended complaint asserts the following claims:

- Count One          writ of mandamus
- Count Two          declaratory judgment
- Count Three        injunctive relief
- Count Four         common-law writ of certiorari
- Count Five         Americans with Disabilities Act ("ADA")
- Count Six          substantive due process
- Count Seven        equal protection

The defendants seek summary judgment as to all counts.  The plaintiff seeks summary judgment as to Counts One, Four, and Seven.[1]

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials

---

[1] The plaintiff moves for summary judgment "as to the causes of action addressed herein," without listing them.  (Doc. 54 at 1).  The only claims addressed by name in its motion are mandamus, certiorari, and equal protection, (*Id*. at 17, 22), and the only relief requested is issuance of writ of mandamus and/or certiorari.  (*Id*. at 26).  The plaintiff says it was denied procedural due process, (*id*. at 18, 26), but the second amended complaint pleads no such cause of action.  The plaintiff says it was denied substantive due process, (*id*. at 26), but its motion does not address that claim.  The plaintiff's motion therefore places before the Court only Counts One, Four, and Seven.

on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 n.19 (11th Cir. 1991) (en banc).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *Four Parcels*, 941 F.2d at 1438 (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[2]  Likewise, "[t]here is no burden upon the district court to distill every

---

[2] "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record," and "[t]he court need consider

3

potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995); *accord Gennusa v. Canova*, 748 F.3d 1103, 1116 (11th Cir. 2014).  The Court accordingly limits its review to those arguments the parties have expressly advanced.

## I.  Americans with Disabilities Act.

Count Five alleges that the defendants violated Title II of the ADA by denying the Application and by enacting Ordinance 2127.  These actions allegedly discriminated against persons with disabilities and also discriminated against the plaintiff based on its association with persons with disabilities.  Count Five further alleges that the defendants violated Title II by failing to make reasonable modifications to their policies, practices, and/or procedures necessary to prevent such discrimination.  (Doc. 1-6 at 176-77).

"A plaintiff may base a Title II claim on any of three theories of liability: disparate treatment (intentional discrimination), disparate impact, or failure to make a reasonable accommodation."  *Hamilton v. Westchester County*, 3 F.4th 86, 91 (2nd Cir. 2021) (internal quotes omitted); *accord Sosa v. Massachusetts Department of Correction*, 80 F.4th 15, 30 (1st Cir. 2023); *Payan v. Los Angeles Community College District*, 11 F.4th 729, 738 (9th Cir. 2021); *J.V. v. Albuquerque Public Schools*, 813 F.3d 1289, 1295 (10th Cir. 2016); *National Federation of the Blind v. Lamone*, 813 F.3d 494, 503 n.5 (4th Cir. 2016).  Count Five invokes the first and third of these theories.[3]

The defendants raise numerous arguments in opposition to Count Five.  Among them are:  (1) that Title II provides no cause of action in favor of non-disabled individuals

---

only the cited materials ...."  Fed. R. Civ. P. 56(c)(1)(A), (3); *accord HRCC, Ltd. v. Hard Rock Cafe International (USA), Inc*., 703 Fed. Appx. 814, 817 (11th Cir. 2017).

[3] Count Five alleges that the defendants "discriminated against" the plaintiff and disabled persons.  (Doc. 1-6 at 176).  Both disparate treatment and disparate impact are types of discrimination, *e.g., Spivey v. Beverly Enterprises, Inc*., 196 F.3d 1309, 1312 (11th Cir. 1999), but only disparate treatment involves discriminatory intent.  *Id*.; *accord Schaw v. Habitat for Humanity, Inc*., 938 F.3d 1259, 1273-74 (11th Cir. 2019).  Because the plaintiff insists that it is based on the contention "that Defendants *intentionally* treated Plaintiff adversely," (Doc. 7 at 3 (emphasis added)), Count Five includes no disparate impact theory of liability.

or entities based on their association with disabled individuals; (2) that, assuming such a cause of action exists, the plaintiff lacks standing to assert it because the plaintiff claims only injuries other than personal exclusion, denial of benefits, or discrimination; (3) that the plaintiff has insufficient evidence of its association with disabled persons; and (4) that the plaintiff cannot establish that any disabled person with whom it is associated has been excluded from participation in, or denied the benefits of, any service, program, or activity of the City.  As intriguing as some of these arguments are, the Court need not address them, because the plaintiff's ADA claim fails for more straightforward reasons advanced by the defendants.

### A.  Disparate Treatment.

Title I of the ADA prohibits discrimination in employment "on the basis of disability."  42 U.S.C. § 12112(a).  Title III similarly prohibits discrimination in the context of public accommodation "on the basis of disability."  *Id*. § 12182(a).  Prior to its 2008 amendment, Section 12112(a) prohibited discrimination "because of" disability.  As used in the ADA, both phrases -- "on the basis of" and "because of" -- "impos[e] a 'but-for' causation standard -- that is, an adverse employment action would not have occurred but for the plaintiff's disability."  *Akridge v. Alfa Insurance Companies*, 93 F.4th 1181, 1192 (11th Cir. 2024).[4]

Titles I and III also contain explicit prohibitions on discrimination against a plaintiff "because of the known disability of an individual with whom the [plaintiff] is known to have a relationship or association."  42 U.S.C. §§ 12112(b)(4), 12182(b)(1)(E).  Title II does not include a similar provision, but several appellate courts have held or

---

[4] The Eleventh Circuit has construed "because of" within the ADA to mean but-for causation since at least 1996.  *McNely v. Ocala Star-Banner Corp*., 99 F.3d 1068, 1076 (11th Cir. 1996).

assumed that a similar proscription exists under Title II.[5]  Courts doing so have imported the same "because of" language formerly employed by Titles I and III.[6]  The plaintiff acknowledges that it bears the burden of proving the defendants discriminated against it "because of" its association with disabled persons.  (Doc. 75 at 18, 19).

Because Title II is part of the ADA, because "our Court has long understood the ADA as imposing a 'but-for' causation standard," *Akridge*, 93 F.4th at 1192, including when the statute uses the phrase, "because of," *id*., and because the "'but for' common law causation test ... supplies the default or background rule against which Congress is normally presumed to have legislated, including for federal antidiscrimination laws," *id*. (internal quotes omitted), the Court concludes that this "but for" standard governs the plaintiff's claim under Title II.  As discussed below, the plaintiff's claim would fail regardless of how lax a causation measure is employed.[7]

The plaintiff first challenges the defendants' denial of its Application.  The defendants have submitted the transcript of the Council meeting at which the Application was denied.  (Doc. 73-8).  All five councilmen, plus the mayor, voted to deny the Application.  (*Id*. at 26-27).  Three of the councilmen, plus the mayor, placed on the record their reasons for voting as they did, and none of them remotely implicate disabled

---

[5] *A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 362-64 (4th Cir. 2008); *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 333-35 (6th Cir. 2002); *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 46-48 (2nd Cir 1997).

[6] *A Helping Hand*, 515 F.3d at 364; *MX Group*, 293 F.3d at 334-35.  The regulations governing Title II, echoing the statutory language of Titles I and III, provide that "[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity *because of* the known disability of an individual with whom the individual or entity is known to have a relationship or association."  28 C.F.R. § 35.130(g) (emphasis added).

[7] The plaintiff posits that the causation element is satisfied unless the decision was made "for reasons wholly unrelated to disability."  (Doc. 75 at 19).  The *Akridge* Court has already rejected such a standard.  93 F.4th at 1192 (it is not enough that disability be a "motivating factor" in the decision).  As discussed in text, the plaintiff is unable to satisfy even its proposed watered-down, inapposite standard.

6

persons or any association of the plaintiff with disabled persons.[8]  This evidence is sufficient to negate an element of the plaintiff's case[9] and shift to the plaintiff the burden to show, by record evidence, a genuine issue of fact as to whether the defendants actually denied the Application because of the disability of persons associated with the plaintiff.

The plaintiff has not carried its burden.  In challenging the denial as arbitrary and capricious, the plaintiff has made arguments why it believes the defendant's articulated reasons were not the real reasons the Application was denied, but it has offered no evidence of any kind to suggest that the real reason for the denial was, or even included, the disability of persons associated with the plaintiff.

Instead, the plaintiff argues that, when the defendants denied the Application, they had constructive knowledge of both the plaintiff's association with disabled persons (because the customers of a golf cart rental business "inherently includ[e]" disabled persons) and their legal obligations under Title II not to deny such persons equal opportunity to participate in and benefit from public services delivered through a licensing regime.  Denial of the Application under these circumstances, the plaintiff says without explanation, was a denial "because of" the plaintiff's association with disabled persons.  (Doc. 75 at 19-20).

This is a breathtaking proposition.  If the plaintiff is correct, every decision by a governmental entity adverse to a disabled person (or one associated with such a person)

---

[8] Councilman Sinak:  "My problem is, how are you going to control it?  And I think it would develop into a bad problem."  (Doc. 73-8 at 14).  Mayor Craft:  "I am uncomfortable as [Sinak] is in having uncontrolled [sic]."  (*Id*. at 15).  Councilman Harris:  "So to me, it's a life safety issue.  And for that reason, I won't be able to support it."  (*Id*. 17).  Councilman Garris:  "[I]t's life safety for me also ...  I just can't support it at this point right here without some very stringent stipulations on it."  (*Id*. at 19).

[9] When the decisionmaker is a multi-member body, the plaintiff must show that a majority of the members voting for the unfavorable decision harbored an unlawful motivation. *Matthews v. Columbia County*, 294 F.3d 1294, 1295 (11th Cir. 2002) ("[A] county can[not] be held liable, under Section 1983, when some -- but less than a majority -- of the county's commissioners vote to eliminate a public employee's job for an unconstitutional reason."); *accord McCarthy v. City of Cordele*, 111 F.4th 1141, 1146 (11th Cir. 2024) (same rule for claims of employment discrimination under Title VII, Section 1981, and Section 1983).

would, so long as the disability and/or association is known by the decisionmaker, automatically present a triable issue as to the decisionmaker's motivation. This would be so even when, as here, the decisionmaker's non-discriminatory reasons for its decision are on the record and the plaintiff has zero evidence that the decisionmaker instead relied on disability and/or association as the basis for the decision. Extended to the Title VII context, such a rule would permit a plaintiff faced with unchallenged evidence that the employer fired her, say, due to her chronic absenteeism and workplace misconduct, to avoid summary judgment simply by pointing out that the employer knew she was female. And to avoid summary judgment under such circumstances would be to say that a jury may permissibly find for the plaintiff, regardless of the defendant's evidence of its legitimate, nondiscriminatory reasons for the adverse decision, based on nothing more than the plaintiff's known membership in a protected group. The plaintiff offers no legal authority or discernible rationale for its proposed rule, and the Court will search for none on its behalf.

The plaintiff next challenges the adoption of Ordinance 2127. The defendants have submitted the ordinance, and its "whereas" clauses set forth reasons for its adoption. (Doc. 50-13 at 3). None of these reasons remotely implicate disabled persons or any association of the plaintiff with disabled persons.[10] The burden thus shifts to the plaintiff to show a genuine issue as to whether Ordinance 2127 was really enacted because of the disability of persons associated with the plaintiff. The plaintiff again offers only its *ipse dixit* that an adverse decision, taken with constructive knowledge of the plaintiff's status, suffices to create a triable issue as to discriminatory intent. (Doc. 75 at 19-20). The argument fails for reasons already given.[11]

---

[10] Those reasons center on perceived risks to public safety from the operation of golf carts in the many parts of the City where such use is prohibited and from their operation, even in authorized areas, in an illegal, unskilled, or careless manner.

[11] As noted, Count Five alleges both that the defendants discriminated against the plaintiff and that they discriminated against "individuals with disabilities." (Doc. 1-6 at 176). The plaintiff subsequently limited Count Five to "an association discrimination claim." (Doc. 7

## B. Reasonable Modification.

Title II prohibits specified forms of discrimination against a "qualified individual with a disability." 42 U.S.C. § 12132. A "qualified individual with a disability" is a person with a disability "who, with or without reasonable modifications to rules, policies, or practices, ... meets the essential eligibility requirements" to receive services or participate in programs or activities provided by a public entity." *Id*. § 12131(2). The Department of Justice has promulgated an implementing regulation providing that a public entity "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i). Count Five alleges that the defendants failed in this modification duty. (Doc. 1-6 at 176).

Congress has embedded reasonable-accommodation[12] protections "throughout the Americans with Disabilities Act," as well as within the Rehabilitation Act ("RA") and the Fair Housing Act ("FHA"), and the Eleventh Circuit "look[s] to case law under" all three regimes in resolving issues arising under any of them. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1220 (11th Cir. 2008). The plaintiff follows suit, expressly relying on authority under the FHA. (Doc. 75 at 22). The Court therefore does likewise.

The defendants, relying on *Rylee v. Chapman*, 316 Fed. Appx. 901 (11th Cir. 2009), argue that no duty of modification ever arose because neither the plaintiff nor any disabled customer or potential customer of the plaintiff ever requested one. (Doc. 50 at 20-22). In *Rylee*, decided under Title II, the panel ruled that "the defendant's duty to provide a reasonable accommodation is not triggered until the plaintiff makes a 'specific demand' for an accommodation." 316 Fed. Appx. at 906 (quoting *Gaston v. Bellingrath Gardens & Home, Inc*., 167 F.3d 1361, 1363 (11th Cir. 1999)).

---

at 3). Even had it not done so, the discussion in text confirms that the plaintiff could not survive summary judgment as to any claim brought on behalf of non-party disabled persons.

[12] Title II appears to be unique in its use of "modification" rather than "accommodation." The Court uses the former term when discussing Title II, but many authorities, including some quoted herein, use "accommodation" in this context.

Because *Rylee* is unpublished, it is not binding authority,[13] but it appears to be of a piece with published Eleventh Circuit opinions in this field. *See Gaston*, 167 F.3d at 1363 (under Title I of the ADA, "[T]he duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made ...."); *Charles v. Johnson*, 18 F.4th 686, 703 (11th Cir. 2021) ("Of course, the duty to provide a reasonable accommodation [under the RA] is not triggered unless a specific demand for an accommodation has been made.") (internal quotes omitted); *Schwarz*, 544 F.3d at 1219 ("Simply put, a plaintiff must actually request an accommodation and be refused in order to bring a reasonable accommodation claim under the FHA."). More recently and most importantly, the Eleventh Circuit has identified the elements of a failure-to-accommodate claim that " a plaintiff must prove" under both the FHA and Title II to include "that [the plaintiff] requested a reasonable accommodation" and "that the defendant refused to make the requested accommodation." *Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 46 F.4th 1268, 1279-80 (11th Cir. 2022) (internal quotes omitted). The Court therefore concludes that Title II requires the plaintiff to prove that it requested a modification.

The plaintiff concedes that it made no request for any modification at any point prior to asserting an ADA claim in its second amended complaint. It argues that this failure is immaterial for two reasons: (1) the request requirement applies only in the case of individual plaintiffs seeking individualized relief; and (2) the ADA claim itself, supplemented by information provided during the discovery process, functions as its request for modification. (Doc. 75 at 22-23).

For its first argument, the plaintiff relies on nothing beyond the trivially true observation that *Rylee* involved an individual plaintiff, without offering any authority accepting its proposed distinction and no explanation why the Court should do so. The

---

[13] "[U]npublished decisions are not binding authority and they are persuasive only to the extent that a subsequent panel finds the rationale expressed in that opinion to be persuasive after an independent consideration of the legal issue." *Koletas v. United States*, 159 F.4th 813, 820 (11th Cir. 2025) (internal quotes omitted).

10

plaintiff simply posits that no request should be necessary when a prospective service provider challenges a governmental entity's blanket ban on that service, thereby affecting both disabled and non-disabled prospective customers of the provider.  (Doc. 75 at 23).

*Schwarz* is fatal to the plaintiff's argument.  The individual plaintiff in *Schwarz*, through the entity defendant ("Gulf Coast Recovery"), operated several halfway houses for recovering substance abusers.  After receiving multiple complaints from neighbors, the defendant city investigated and then cited the plaintiffs for violating a zoning ordinance that limited occupancy turnover.  The plaintiff sued under various theories, including under the FHA for failure to accommodate.  544 F.3d at 1205.  Before filing suit, the plaintiffs "never requested an accommodation or explained to the City why [they] needed an accommodation."  *Id*. at 1219.  This meant the city had never "'refused' a reasonable accommodation," a "fatal" defect in the FHA claim.  *Id*.   The panel so ruled even though the city plainly knew, from the neighbor complaints, its own investigation, and the entity's name, that the plaintiffs were serving recovering substance abusers.  *Id*. at 1207-09.

As in *Schwarz*, so here.  If a business overtly catering exclusively to a class of persons that are (or are regarded as) disabled must still request accommodation, so too must a business like the plaintiff, which only incidentally includes disabled persons within a customer base composed of the public generally.[14]

At first blush, *Schwarz* appears to support the plaintiff's second argument, because it found an accommodation request, and a refusal of that request, to have occurred after the lawsuit was filed.  544 F.3d at 1219.  In *Schwarz*, however, the defendant intimated at a preliminary injunction hearing that it would consider an accommodation were one

---

[14] In the Fifth Circuit, a plaintiff asserting a violation of the reasonable-modification requirement under Title II can proceed, despite its failure to request accommodation, "by showing that the disability, resulting limitation, and necessary reasonable accommodation were open, obvious, and apparent to the entity's relevant agents." *Windham v. Harris County*, 875 F.3d 229, 237 (5th Cir. 2017) (internal quotes omitted).  The Eleventh Circuit has not adopted an open-and-obvious exception to the request requirement, *Reeves v. Commissioner*, 23 F.4th 1308, 1321 (11th Cir. 2022), and the plaintiff does not ask the Court to do so.

11

sought, the parties agreed to the magistrate judge's suggestion that they discuss a compromise, the plaintiff then presented a formal request for reasonable accommodation along with supporting information, the parties discussed together the proposal and whether an accommodation was required, and the city rejected the proposal after concluding that no accommodation was necessary and that the proposed accommodation would (contrary to its legal obligations) fundamentally alter its zoning scheme. *Id*. at 1210, 1219.

Nothing remotely resembling this scenario has occurred here. The plaintiff relies on its filing of an ADA claim in this Court as constituting its request for accommodation, but the *Schwarz* panel ruled that the filing of such a claim, without a prior request for accommodation, negated a refusal of accommodation. 544 F.3d at 1219. Nor did the panel suggest that filing a lawsuit can itself constitute a request for accommodation; instead, the Court relied exclusively on litigation conduct *following* initiation of the action. The only such conduct on which the plaintiff relies is its production of communications from four potential customers indicating that they or someone in their party may be disabled and may benefit from a golf cart rental. (Doc. 75 at 22; Doc. 75-2). This material may show that the defendant now knows the plaintiff's projected customer base includes disabled persons, but it does not constitute an acceptable post-litigation request for accommodation under the *Schwarz* paradigm.

The plaintiff relies on *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213 (11th Cir. 2016), another FHA case, for the proposition that "a plaintiff can be said to have made a request for accommodation when the defendant has enough information to know of both the disability and desire for an accommodation," *id*. at 1226 (internal quotes omitted), and it suggests its second amended complaint, combined with the communications from potential customers produced during discovery, meets this threshold. (Doc. 75 at 22). Once litigation is filed, however, it is too late to rely on *Hunt*; the plaintiff at that point must show that, as in *Schwarz*, the defendant agreed to entertain an otherwise tardy, and thus ineffectual, request for accommodation. Without such acquiescence, the defendant

12

may successfully resist a reasonable-accommodation claim on the grounds the plaintiff made no pre-suit request for accommodation.

There is a shorter road to the same result. Count Five depends on the allegation that the defendants, *before* the ADA claim was filed, had unlawfully "failed [past tense] to make reasonable modifications." (Doc. 1-6 at 176). The plaintiff cannot possibly prove that claim, because it admits it made no request for modification prior to filing suit and, as discussed above, the law is clear that any failure to modify that is not preceded by a request for modification will not support liability. The plaintiff now attempts to assert a different ADA claim, one found nowhere in its pleadings: that the defendants, *after* suit was filed, failed to honor a modification request made after suit was filed. The plaintiff, however, is limited to the claim it actually pleaded. "A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).[15]

## II.  Substantive Due Process.

Count Six alleges that the defendants' denial of a business license deprived the plaintiff of its right to pursue a lawful occupation and constituted a violation of the plaintiff's substantive due process rights. (Doc. 1-6 at 177-78).[16]

---

[15] *Accord Matamoros v. Broward Sheriff's Office*, 2 F.4th 1329, 1336 n.6 (11th Cir. 2021) (plaintiff could not by brief expand her retaliation claim by identifying an additional protected activity for engaging in which she experienced retaliation); *Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017) (plaintiff could not by brief inject a new theory of supervisory liability); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 705-06 (11th Cir. 2021) (plaintiff could not by brief expand his defamation claim by identifying additional allegedly false statements).

[16] The plaintiff insists that Count Six also asserts a substantive due process claim based on Ordinance 2127. (Doc. 75 at 25 n.12). Although Count Six nowhere mentions the ordinance, the plaintiff notes that it does "adop[t] and incorporat[e] each of the preceding allegations as if fully set out herein." (Doc. 1-6 at 177). The allegations on which the plaintiff relies, however, merely allege that Ordinance 2127 prevented the plaintiff from serving disabled persons and seek recovery for this interference under the ADA. (*Id*. at 170, 176-77). While Count Five alleges that both the denial of a business license and the enactment of Ordinance 2127 violated the plaintiff's rights, Count Six (like Count Seven) alleges only that the denial of a business license

13

The substantive due process analysis depends in part on whether the challenged state action is executive or legislative in nature. The parties agree that the denial of the plaintiff's Application was an executive decision for purposes of analyzing Count Six. (Doc. 50 at 22-23; Doc. 75 at 23).

Substantive due process analysis also depends on the nature of the right interfered with, the degree of the infringement, and the quality of the government's conduct. As to the nature of the right, "[t]he substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty ....'" *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)). The Eleventh Circuit has indicated that only fundamental rights will support a substantive due process claim based on executive action. *See Hillcrest Property, LLP v. Pasco County*, 915 F.3d 1292, 1297 (11th Cir. 2019) ("[S]ubstantive due process has two strands – one that protects against deprivation of fundamental rights and one that protects against arbitrary legislation."). The appellate court, however, has also suggested that a substantive due process claim challenging executive action may succeed even when the right infringed upon is not fundamental. *Littlejohn v. School Board of Leon County*, 132 F.4th 1232, 1240 (11th Cir. 2025) ("[T]he executive-action framework we've described above governs all substantive-due-process claims involving executive action -- *even those* involving fundamental rights.") (emphasis added). The Court need not resolve the apparent tension between these two expressions, because the plaintiff's claim fails whether or not the deprivation of a fundamental right is an essential element of its claim.

violated the plaintiff's rights. (*Id*.). And while Count Five seeks as relief both the issuance of a business license and the nullification of the ordinance, Count Six (like Count Seven) seeks only issuance of a business license. (*Id*. at 177-78). The Court therefore agrees with the defendants that the second amended complaint contains no substantive due process claim based on Ordinance 2127. The Court also rejects the plaintiff's unsupported assertion that the defendants, by anticipatorily addressing on the merits this non-existent claim (because the plaintiff had threatened to inject it into the proceedings via dispositive motion), somehow made the claim a part of the case pursuant to Rule 15(a)(2). (Doc. 75 at 25 n.12).

14

The plaintiff alleges that the denial of its application interfered with its "fundamental ... right to pursue a lawful occupation." (Doc. 1-6 at 177).  The defendants deny the existence of a fundamental liberty right to pursue a "particular occupation." (Doc. 50 at 24-25).

"While this court has not attempted to define with exactness the liberty thus guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated.  Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual ... to engage in any of the common occupations of life ...."  *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).  This right is not unfettered:  "[T]he right ... to follow a chosen profession free from *unreasonable* governmental interference comes within the 'liberty' ... concep[t] of the Fifth Amendment."  *Greene v. McElroy*, 360 U.S. 474, 492 (1959) (emphasis added).  "[T]his Court has indicated that the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation."  *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999).

Even though the Supreme Court has identified the source of the right to pursue a profession or occupation as the Fifth and Fourteenth Amendments, and even though *McKinney* recognized that "most -- but not all -- of the rights enumerated in the Bill of Rights are fundamental," 20 F.3d at 1556, the Eleventh Circuit, in the case principally relied upon by the defendants, stated that the Supreme Court "has never held that the right to pursue a particular occupation is a fundamental right."  *Jones v. Board of Commissioners*, 737 F.2d 996, 1000 (11th Cir. 1984).  Even after *McKinney*, the Court has stated that "the right to practice a particular profession is not a fundamental one." *Locke v. Shore*, 634 F.3d 1185, 1195 (11th Cir. 2011); *accord Helm v. Liem*, 523 Fed. Appx. 643, 645 (11th Cir. 2013).  Because the plaintiff does not take issue with the defendants' position, the Court accepts for purposes of this motion that any right of the plaintiff to engage in the rental of golf carts within the City is not a fundamental right for purposes of substantive due process analysis.

As to the degree of infringement, the Supreme Court's cases "all deal with a complete prohibition of the right to engage in a calling." *Conn*, 526 at 292. In *Greene*, for example, the government's revocation of the plaintiff's security clearance cost him not only his job but "seriously affected, if not destroyed, his ability to obtain employment in the aeronautics field." 360 U.S. at 492. In line with these decisions, Eleventh Circuit cases have recognized that various partial restrictions on a plaintiff's pursuit of their occupation or profession fail to impinge sufficiently on their liberty interests to support a substantive due process claim. *See Morley's Auto Body, Inc. v. Hunter*, 70 F.3d 1209, 1217 n.5 (11th Cir. 1995) (where the plaintiffs' removal from the sheriff's wrecker rotation list (which was used to summon tow vehicles when law enforcement responded to an accident or breakdown) did not affect their right to operate their wrecker service business, to remove vehicles from public property at the request of the owners, or to provide services to any member of the public requesting it, the removal from the rotation list "d[id] not cognizably burden the plaintiffs' liberty to follow a chosen profession free from unreasonable governmental interference") (internal quotes omitted); *Pirolo v. City of Clearwater*, 711 F.2d 1006, 1008, 1011 (11th Cir. 1983) (plaintiff airport operator's right to follow a profession free from unreasonable interference was not infringed by a city ordinance that prevented night flying and required certain air traffic patterns for takeoffs and landings, because the plaintiff "could have continued in his profession, either at another location or under the restrictions imposed"); *Ming Wei Liu v. Board of Trustees*, 330 Fed. Appx. 775, 780-81 (11th Cir. 2009) (government's stigmatizing conduct would not support a substantive due process claim, because the plaintiff failed to show that the conduct "entirely foreclosed his freedom to pursue employment in his chosen field") (citing other Eleventh Circuit cases). The defendants rely on *Moates v. Strength*, 57 F. Supp. 2d 1305 (M.D. Ala. 1999), which stands for much the same proposition. Id. at 1306-07, 1309 (in light of *Pirolo*, sheriff's denial of a business license to operate as a private detective would not support a substantive due process claim, since the plaintiff remained free to work as a detective for a licensed agency or to pursue his profession in another county).

16

Under these cases, a plaintiff's liberty interest in pursuing an occupation or profession, even if fundamental, cannot be unconstitutionally infringed unless the degree of infringement approaches an exclusion from the occupation or profession. The defendants' denial of the requested business license plainly does not approach this level. The plaintiff is a rental company located in Orange Beach (not the City) that rents slingshots, Jeeps, baby equipment, and various other beach paraphernalia, in addition to offering overflow parking for condos. (Doc. 50-4 at 6-7). It has held a business license allowing it to make such rentals within the City since 2019. (Doc. 74 at 1; Doc. 75 at 24). Although denial of the Application means the plaintiff may not rent golf carts within the City, it does not prevent the plaintiff from engaging in any other aspect of its business within the City, or any aspect at all outside the City.[17]

As to the quality of the government's conduct, "[e]xecutive action is arbitrary in a constitutional sense when it 'shocks the conscience.'" *Waldman v. Conway*, 871 F.3d 1283, 1292 (11th Cir. 2017) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). "Even intentional wrongs seldom violate the Due Process Clause, ... and 'only the most egregious official conduct'" can meet the shocks-the-conscience standard. *Maddox v. Stephens*, 727 F.3d 1109, 1119 (11th Cir. 2013) (quoting *County of Sacramento*, 523 U.S. at 846). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *County of Sacramento*, 523 U.S. at 849. The "concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* at 850.

In this case, what happened to the plaintiff happens to citizens, perhaps hundreds of citizens, every day: a business license was denied. It is not enough to say, if it be true, that the license should have been granted, or even that it obviously should have been granted, because substantive due process "does not entail a body of constitutional law

---

[17] The plaintiff has indicated that it operates in at least 19 jurisdictions, (Doc. 73-8 at 26), extending all the way to Pensacola. (Doc. 73-7 at 11).

17

imposing liability whenever someone cloaked with state authority causes harm," and "negligently inflicted harm is categorically beneath the threshold of constitutional due process." *County of Sacramento*, 523 U.S. at 848-49.

To show that the denial of its Application was sufficiently egregious to support a constitutional claim, the plaintiff asks the Court to focus on the following alleged circumstances:  (1) in April 2022, the defendants required the plaintiff to apply for a new business license for golf carts even though its existing business license was broad enough to cover golf carts; (2) in May 2022, they cited the plaintiff's principal for doing business (*i.e.*, renting golf carts) without a license, even though the plaintiff's business license allowed it to do so; (3) in August 2022, they denied the Application without articulating their reasons; (4) in June 2023, they moved to *nolle pros* the criminal citation and thereby implicitly conceded the citation was created to manufacture a reason to deny the Application; (5) in August 2024, they adopted Ordinance 2127 in direct response to the plaintiff's April 2022 Application and August 2022 filing of this lawsuit; and (6) the City itself continues to use golf carts and allow others to do so. (Doc. 75 at 4, 7, 9, 24).  These circumstances, the plaintiff says, would allow a properly functioning factfinder to conclude that the defendants "used their licensing and ordinance powers not as an ordinary, good-faith application of pre-existing policy, but as a coordinated effort to exclude an existing licensee from a legitimate, state-recognized vehicle category and to reserve that space for City-favored uses and vendors."  The alleged conduct, the plaintiff says, undertaken for such a purpose, would reflect an intent to injure the plaintiff in a way unjustifiable by any government interest and thus support its substantive due process claim.  (*Id*. at 24-25).

Interesting as it is, the Court declines to evaluate the plaintiff's argument.  First, it implicates the ongoing criminal appeal of the plaintiff's principal regarding two convictions on similar charges dating to 2024, the result of which will impact if not resolve the significance of the plaintiff's first, second, and fourth alleged circumstances. (Docs. 68, 76).  Second, the defendants did not deign to respond to the plaintiff's argument.  Third, neither side offers any legal authority addressing the shocks-the-

18

conscience standard in the context of a business license or similar setting. Fourth, the plaintiff's substantive due process claim is due to be denied on other grounds, regardless of whether the defendants' conduct can be said to shock the conscience.

Because the plaintiff's asserted right is not fundamental, and because this right was not infringed to the point of excluding the plaintiff from its beach equipment rental business, the defendants' motion for summary judgment as to Count Six is due to be granted.

### III.  Equal Protection.

Count Seven alleges that the plaintiff is similarly situated to other applicants who were granted business licenses and that the plaintiff's application was denied without rational justification or legitimate governmental purpose.  (Doc. 1-6 at 178).  Both the defendants and the plaintiff seek summary judgment as to this claim.

The plaintiff does not claim membership in any class or group.  Instead, it proceeds on a "class of one" theory,[18] in which "the plaintiff alleges that [it] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  The burden lies with the plaintiff both to identify a similarly situated comparator and to show the absence of any rational basis for the differential treatment.  *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1202 (11th Cir. 2007).

The plaintiff identifies the following as its comparators:  (1) Island Carts; (2) Jerry Pate Turf & Irrigation ("Jerry Pate"); (3) the City; (4) Craft Farms; (5) various e-bike rental companies; (6) festival vendors; and (7) private residents.  (Doc. 54 at 22-23; Doc. 75 at 27-30).  Because Count Seven confines the universe of comparators to "applicants who were granted business licenses," (Doc. 1-6 at 178), private residents simply operating their own golf carts cannot be considered as comparators.  Neither can the City, as the plaintiff identifies no evidence that the City granted itself a business license;

---

[18] (Doc. 75 at 27; Doc. 79 at 13).

instead, the City merely uses golf carts supplied by out-of-town vendors. (Doc. 75 at 27). As for e-bike rental companies, the plaintiff's own evidence reflects the absence of any granted business licenses. (Doc. 74-2 at 15).

There is evidence that unnamed vendors supply golf carts to the City, other organizers, and those associated with them in connection with festivals and other special events (collectively, "special events"), at least some of which obtain licenses for the rental of golf carts during the event. (Doc. 78-1 at 5; Doc. 78-5 at 3-4). There is evidence that Island Carts, pursuant to a business license, rents golf carts to golf courses and for special events held in the City. (Doc. 50-12 at 2; Doc. 54-19 at 5, 18; Doc. 75-3 at 2-4; Doc. 78-2 at 4; Doc. 78-4 at 8). There is evidence that Jerry Pate, pursuant to a business license, rents golf carts to golf courses and for special events. (Doc. 50-12 at 2; Doc. 74-5 at 3-4; Doc. 75-3 at 5-11; Doc. 78-2 at 6). And although there is no evidence that Craft Farms rents golf carts, the defendants assume it does so, pursuant to its business license to operate a golf course. (Doc. 78 at 15; Doc. 74-3 at 7). In light of this evidence, the Court gives the plaintiff the benefit of four comparators identified consistent with its second amended complaint.

Ordinance 1835, which predates the plaintiff's application, permits the operation of golf carts on certain listed City streets ("designated cart streets") within certain intact "golf course residential communities and other communities." (Doc. 50-1 at 3). Ordinance 1835, which has been amended several times to include additional designated cart streets, is codified as Section 21-13 of the City's municipal code. At the time of the plaintiff's Application, the designated cart streets were located in: Gulf Wood Highlands subdivision; Cypress Park subdivision and surrounding area; Craft Farms; Martyn Woods at Bon Secour; and Aventura. (Doc. 73-1 at 3-6). Since its 2017 adoption, Ordinance 1835 has made it unlawful to operate a golf cart on any public street within the City that is not listed as a designated cart street, and no street with a speed limit exceeding 25 mph may be so designated. (Doc. 50-1 at 6, 9). *See also* City of Gulf Shores Municipal Code § 21-13(b), (d)(1).

The plaintiff's Application described the business to be licensed as "golf cart rentals." (Doc. 50-5 at 2). The plaintiff's proposed business model was to rent golf carts to short-term renters in the areas allowed by Section 21-13 and in private communities and RV parks within the City but outside the designated cart street areas. (Doc. 73-7 at 8-9; Doc. 73-8 at 11-12). The plaintiff does not dispute the defendants' summation of its business model as that "it intends to rent golf carts to the public in general, including visiting tourist[s]," (Doc. 73 at 20), "for use on City streets." (*Id.* at 22).

The evidence is uncontroverted that neither Island Carts nor Jerry Pate rents golf carts to the general public. (Doc. 50-12 at 2; Doc. 78-1 at 8; Doc. 78-2 at 4, 5-6).

The evidence is uncontroverted that Craft Farms is private property and that golf carts rented to and/or used by golfers at Craft Farms are operated on its private property. (Doc. 78-6 at 3). The only exception is when these carts cross (not ride along) City streets within the property to access the next hole. (Doc. 78-5 at 5). Each of these streets is, and has been since 2017, a designated cart street. (Doc. 50-1 at 5-6; Doc. 73-1 at 5).

The evidence is uncontroverted that golf carts rented to and/or used by golfers at other golf courses within the City remain on private property except when crossing (not riding along) City streets to reach the next hole. (Doc. 74-6 at 10). There is no evidence that any of these crossings are over non-designated cart streets. (*Id.* at 7-8). Nor is there any evidence that Island Carts or Jerry Pate rents golf carts to any such golf course.

The evidence is uncontroverted that golf carts rented in connection with special events are rented only to organizers and to their vendors and others associated with putting on the event. (Doc. 74-2 at 28; Doc. 78-1 at 5; Doc. 78-5 at 3-4). These golf carts are used for event-related purposes such as hauling equipment, ice, and trash; they are not used for fun and games or as a substitute for walking. (Doc. 74-2 at 28). Their permitted use is confined to the footprint of the event, (*id.*; Doc. 78-1 at 5; Doc. 78-5 at 3-4), which footprint is restricted from motor vehicle traffic. (Doc. 74-2 at 30).

"To be similarly situated [for purposes of class-of-one analysis], the comparators must be prima facie identical in all relevant respects." *Grider v. City of Auburn*, 618 F.3d 1240, 1264 (11th Cir. 2010) (emphasis and internal quotes omitted). According to the

plaintiff, the only "relevant respects" are "whether entities are putting vehicles into operation on City streets and rights-of-way under the same basic traffic and safety conditions," (Doc. 75 at 27), by which it means "generating the same kind of interaction with vehicles and pedestrians as [the plaintiff's] rental carts would." (*Id*. at 28). According to the defendants, the relevant respects include the customer base, the geographic location, and the usage of the golf carts. (Doc. 73 at 20, 22, 25-26).

The plaintiff's customer base extends to the general public, with an emphasis on short-term renters; its comparators' customer base is restricted to golf courses, golfers on those courses, and organizers of special events, along with vendors and others associated with putting on such events. The plaintiff's geographical location extends to golf communities and other communities with designated cart streets, private communities lacking designated cart streets, and RV parks; its comparators' geographic location is restricted to golf courses and the footprint of special events. The usages of the plaintiff's rentals extend to pleasure travel on City streets, as well as within private communities and RV parks; the usages of its comparators' rentals are restricted to playing golf on private property and working special events in restricted locations, with such rentals supporting significant contributors to the City's economy.

"In this Circuit, we apply the similarly situated requirement with rigor." *PBT Real Estate, LLC v. Town of Palm Beach*, 988 F.3d 1274, 1285 (11th Cir. 2021) (internal quotes omitted). "Employing too broad a definition of 'similarly situated' could subject nearly all state regulatory decisions to constitutional review in federal court and deny state regulators the critical discretion they need to effectively perform their duties." *Leib v. Hillsborough County Public Transportation Commission*, 558 F.3d 1301, 1307 (11th Cir. 2009) (internal quotes omitted). Therefore, "[a] plaintiff must ultimately show that it and any comparators are similarly situated in light of all the factors that would be relevant to an objectively reasonable government decisionmaker." *PBT*, 988 F.3d at 1285 (internal quotes omitted). Thus, for example, to show that two apartment projects are similarly situated, they must have "essentially the same size, [with] an equivalent impact on the community, and requir[ing] the same zoning variances." *Griffin Industries*, 496

F.3d at 1204  (emphasis and internal quotes omitted) (describing *Campbell v. Rainbow City*, 434 F.3d 1306 (11th Cir. 2006)).

The plaintiff correctly notes that golf carts rented by its comparators, like those to be rented by the plaintiff, are subject to interaction with motor vehicles and/or pedestrians on City streets.  An objectively reasonable governmental decisionmaker, however, would consider the frequency and degree of such interaction, the location of such interaction, and the purpose for which the golf carts are used, to be factors relevant in evaluating the appropriateness of such rentals, for the obvious reason that such factors affect both the degree of utility to the community afforded by the rentals and the degree of nuisance and danger they pose.  Because the plaintiff and its proposed comparators are different in these key relevant respects, the plaintiff's equal protection claim fails for want of a similarly situated comparator.[19]

In its motion for summary judgment, the plaintiff argues that the defendants selectively enforced a facially neutral licensing scheme for the purpose of discriminating against it.  (Doc. 54 at 22).  This appears to be only a restatement of its class-of-one claim but, in any event, the "similarly situated" standard, which the plaintiff cannot meet, is the same under either formulation.  *E.g., WBY, Inc. v. City of Chamblee*, 155 F.4th 1242, 1264 (11th Cir. 2025); *Leib*, 558 F.3d at 1306-07.

---

[19] The actual assessment and weighing of these and other relevant respects is immaterial to the "similarly situated" analysis, but even a cursory review of them suggests the plaintiff and its comparators do not have an "equivalent impact on the community" as required by *Griffin Industries*.  As discussed above, rentals to and by golf courses risk interaction with motor vehicles only at designated street crossings, and rentals in connection with special events risk almost no interaction with motor vehicles (since they operate only in restricted spaces); the plaintiff's rentals, in contrast, being intended for operation on City streets, stand to interact with motor vehicles in almost every instance.  Rentals to golfers and for special events, because they are for specific purposes in confined locations, likely carry little risk of golf carts being used in unauthorized locations; the plaintiff's rentals, being primarily to short-term renters and intended for use on City streets for any purpose, including joyrides, may carry increased risk of frolics and detours into unauthorized areas.  Rentals to golfers and for special events directly support the golf and special event economy and thus help drive the local economy, while there is no indication the plaintiff's proposed individual rentals would produce more than normal taxes and fees for the rentals themselves.

23

## IV. Supplemental Jurisdiction.

In general, "[i]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  The Court's original jurisdiction is based exclusively on federal question jurisdiction under 28 U.S.C. § 1331.  (Doc. 1 at 2).  As discussed in Parts I-III, all federal claims asserted in this lawsuit are due to be dismissed with prejudice.

"The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if … the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Because it is dismissing all claims over which it has original jurisdiction, the Court has discretion to remand the remaining state claims under Section 1367(c).[20]

The Court has addressed the supplemental jurisdiction analysis in a pair of recent opinions.  *See 68V BTR Holdings, LLC v. City of Fairhope*, 737 F. Supp. 3d 1222, 1238-40 (S.D. Ala. 2024); *Parker v. Exterior Restorations, Inc.*, 601 F. Supp. 3d 1221, 1228-36 (S.D. Ala. 2022).  The Court repeats much of that discussion below.

Section 1367 became law in 1990.  Before then, such questions were addressed under the judicially developed doctrine of pendent jurisdiction, and Section 1367 "codifies these principles."  *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 173 (1997).  In particular, the discretion imparted by Section 1367(c)(3) is to be exercised "in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine."  *Id*. (internal quotes omitted); *accord Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1123 (11th Cir. 2005).

---

[20] Section 1367(c) applies to removed actions as well as to original actions.  *Cook ex rel. Estate of Tessier v. Sherrif of Monroe County*, 402 F.3d 1092, 1123 (11th Cir. 2005).

"We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney v. Allstate Insurance Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004). This preference exists because, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

The preference for declining supplemental jurisdiction is particularly strong when the federal claims "have dropped out of the lawsuit in its early stages." *Cohill*, 484 U.S. at 350. However, the preference also applies when the federal claims are removed, as here, on motion for summary judgment. *See, e.g., Harris-Billups ex rel. Harris v. Anderson*, 61 F.4th 1298, 1305-06 (11th Cir. 2023); *PBT Real Estate*, 988 F.3d at 1287; *Michael Linet, Inc. v. Village of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005); *Murphy v. Florida Keys Electric Cooperative Association*, 329 F.3d 1311, 1320 (11th Cir. 2003).

Impacts on judicial economy are measured in order to "support the conservation of judicial energy and avoid multiplicity in litigation" or "substantial duplication of effort." *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 746 (11th Cir. 2006). "Evaluating considerations of judicial efficiency and duplication of judicial effort is not just a matter of toting up months or motions or the page counts of judicial orders." *Ameritox, Ltd. v. Millenium Laboratories, Inc.*, 803 F.3d 518, 539 (11th Cir. 2015) (internal quotes omitted). Based on these authorities and the principles underlying them, the length of time a case rested in federal court before remand is irrelevant, as is the amount of discovery conducted there. This is so because neither metric reflects an investment of judicial resources – much less an accumulation of case-specific judicial expertise – that would require duplication in state court. Discovery is long since closed and the parties' dispositive motions directed to the plaintiff's state-law claims remain pending and ripe for resolution, so no duplicative discovery or motion practice will be required (or,

25

presumably, even permissible) upon remand.[21]  The Court, which has focused its efforts on resolving the federal claims, has no comparative advantage over the state court in evaluating the state claims.[22]  In addition, the plaintiff and its principal have filed another civil action in the Circuit Court of Baldwin County against these and other defendants, in which it asserts several tort claims based on denial of the Application,[23] and judicial efficiency counsels that the same tribunal resolve both cases.

As for convenience, the parties are all present in Baldwin County, and litigation in that forum therefore cannot be meaningfully less convenient than litigation here in Mobile County.  As for fairness, it is difficult to imagine what could be unfair about returning the parties to their original forum, where they litigated this case for over two years before the plaintiff added the federal claims prompting the defendants' removal.  As for comity, "[n]eedless decisions of state law should be avoided as a matter of comity and to promote justice between the parties by procuring for them a surer-footed reading of applicable law."  *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

In short, the Court concludes that its discretion under Section 1367(c) should be exercised against retention of the plaintiff's state claims.

## CONCLUSION

For the reasons set forth above, the defendants' motions for summary judgment are **granted** with respect to Counts Five, Six, and Seven, and the plaintiff's motion for summary judgment is **denied** with respect to Count Seven.  Counts Five, Six, and Seven are **dismissed with prejudice**.  Judgment shall be entered accordingly by separate order.

---

[21] The plaintiff might, however, be allowed to reassert its motion to stay pending resolution of a related criminal appeal, (Doc. 68), which the Court denied for lack of a showing that the result of the appeal could impact resolution of the parties' dispositive motions regarding, in particular, the federal claims.  (Doc. 76 at 3 & n.1).

[22] Nor has the Court reviewed the plaintiff's pending *Daubert* motion, (Doc. 53), beyond confirming that it is  irrelevant to the motions for summary judgment regarding the federal claims.

[23] *Gulf Coast Rental Co L.L.C. v. City of Gulf Shores*, CV-2024-901027.00.

The remainder of this action, consisting of Counts One through Four, is **remanded** to the Circuit Court of Baldwin County.

DONE and ORDERED this 17th day of April, 2026.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE
